Myers, J.,
 

 concurring. I concur in the judgment of reversal except as hereinafter stated. For the most part I agree with the majority opinion. As amended in 1935, Section 544, General Code, reads as follows: “A final order made by the commission shall be reversed, vacated or modified by the Supreme Court on appeal, if upon consideration of the record such court
 
 *241
 
 is of the opinion that such order was unlawful or unreasonable.” The present statute, therefore, requires examination of both law and fact as found in the record to determine whether the order is unreasonable or unlawful. I disagree with the majority opinion in the following respects, to wit: The so-called river rate, the rate of return and stock-plan deposits.
 

 In respect to the river rate, what better evidence could there be in the instant case than the .price charged during practically the same period by The Hope Company to East Ohio for another northern Ohio city much larger than Akron? Gas sold by Hope to East Ohio is delivered at the Ohio river. As far as Hope is concerned there is no material difference in the production or buying from independent producers. Since it appears from the record that gas was sold at the Ohio river by Hope to East Ohio for Cleveland for 37.1 cents per M.c.f. there is no valid reason for a different price to East Ohio for Akron when, in the opinion of the writer, the only difference is one of destination after sale and delivery at the river.
 

 There is evidence to the effect that Hope sold gas during the ordinance period to independent companies in West Virginia at approximately 31% cents and to domestic consumers for 34 cents or less, per M.c.f., delivered at the burner tips. While good business policy justified East Ohio in keeping in reserve adequate acreage for future needs, such as the Akron field, that company was not justified at the same time in paying at the Ohio river a much higher price than independent, smáller companies were paying Hope in West Virginia. This evidence of other sales by Hope is more, indicative of a fair market price in the instant case than the method adopted in the majority opinion for the reason that such sales are the result of competition in the West Virginia field. The fact that Hope purchased, gas for 20 cents per M.c.f. at the well mouth and sold
 
 *242
 
 to independent companies at a margin of 12 cents above cost and to domestic consumers at a margin of 14 cents above cost would seem to indicate that a margin of 17.1 cents above cost for transmission to East Ohio at the river is more than reasonable.
 

 Hope is not a principal party in this litigation. As far as this proceeding is concerned it is the marketing company to East Ohio. If it be shown that East Ohio is able to purchase gas for delivery at the river for 37.1 cents per M.c.f., which it is transmitting to Cleveland at a reasonable profit, then it should not be charged more by Hope for gas to be used in Akron. The Hope Company has nothing to do with transmission or distribution beyond the Ohio river. That is the affair of East Ohio. East Ohio, purchasing at the river for one customer in Ohio at 37.1 cents, should not be compelled to pay more for gas coming through the same .lines for another customer. To pay more would be unreasonable. In my opinion 38.5 cents per M.c.f. in this proceeding is unreasonable. A reasonable and adequate rate to be charged East Ohio by Hope for gas delivered at the Ohio river should be 37.1 cents per M.c.f. This would still be considerably higher than prices charged by Hope to unaffiliated independent companies.
 

 In respect to the rate return, we find that East Ohio is in a sound financial position. Its property, its distribution system, its transmission lines, its financial condition, its reserves, all bear witness to the fact that its opportunity for serving municipalities in a large portion of Ohio is secure for years to come. Adequate allowances were made by the commission to enable the company usefully and profitably to serve its customers. Under such conditions the rate of 6% per cent allowed by the commission was unreasonable. The reserves of the company are adequate for any reasonable emergency. It has a reserve gas field near Akron
 
 *243
 
 that, together with gas from Hope, will protect and support its ordinary and peak-load requirements for a good many years to come. The witness, Tonkin, vice-president of the company, testified as to the position of Hope in regard to peak-load requirements. He testified that the greater portion of the gas sold by Hope came from independent operators in order that its own maximum capacity might be held in reserve for peak-load contingencies. This policy insures to East Ohio at all times an adequate supply of gas, thereby taking the question of gas supply out of the field of conjecture into the realm of reality. This is sound business policy, but it is also an added reason why the company should not be allowed an excessive rate of return. Considering all the foregoing elements of security, a return of six per cent is not only adequate but reasonable in every respect.
 

 "While the amount expended by East Ohio toward the so-called stock deposit plan is not large, nevertheless it had no place in the rate-making structure. The purpose may be laudable in itself, but in the manner in which it is here exercised it is only one more difficulty thrown in the path of reasonable rate-making procedure. The amount expended by East Ohio for its employees under this plan was not for purchase of its own stock but stock in the “parent company,” as paragraph eight of the syllabus indicates.
 

 Many of the difficulties in this rate proceeding have their origin in the fact that both Hope and East Ohio have a common parentage. The expenditure of money rightfully belonging to the consumers for the purchase of stock in a parent company exercising dual control over both Hope and East Ohio, was not intended by the statute to be considered for rate-making purposes. Social security payments, referred to in the majority opinion, are imposed by law, and, therefore, a proper cost charge, but the statutes governing this proceeding
 
 *244
 
 do not authorize a voluntary contribution for purchasing stock as set forth in the record. While the amount expended in furtherance of this plan in the instant proceeding is not large, nevertheless the principle involved in using company funds for tying employees of operating utility companies into the financial meshes of a parent holding company should not be encouraged. In regard to this stock deposit plan the order of the commission was'right.